**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x

In re: Chapter 7

RAHUL DEV MANCHANDA, Case No. 23-22095 (SHL)

Debtor.

-----------------------------------------------------------x

WILLIAM K. HARRINGTON,
as United States Trustee for Region 2,

Plaintiff, Adv. Case No. 24-07009

-against-

RAHUL DEV MANCHANDA,

Defendant.

-----------------------------------------------------------x

# MEMORANDUM DECISION ON UNITED STATES TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

**A P P E A R A N C E S:**

**OFFICE OF THE UNITED STATES TRUSTEE**
*United States Trustee*
One Bowling Green, Suite 534
New York, New York 10004
By: Greg Zipes, Esq.

**RAHUL DEV MANCHANDA**
PRO SE

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the motion for summary judgment filed in the above-captioned adversary proceeding by William K. Harrington, the United States Trustee for Region 2 (the "UST," or the "Plaintiff") that objects to the discharge of Debtor Rahul Dev Manchanda under

Sections 727(a)(3), 727(a)(4)(A) and 727(a)(5) of the Bankruptcy Code. Mot. for Summ. J. [ECF No. 31] (the "Motion");[1] Compl. [ECF No. 1]. More specifically, the UST seeks to deny a bankruptcy discharge to the Debtor for his failure to produce information regarding his assets and liabilities, for false oaths, and for his failure to satisfactorily explain any deficiency of assets to meet his liabilities. *See* Motion at Ex. A (the Complaint). Representing himself on a *pro se* basis, the Debtor argues that the UST is incorrect in all its arguments and contentions. *See* Debtor Reply Affirm to AUST Zipes [ECF No. 3] ("Answer"); Debtor Reply Affirm. Opp'n to Summ. J. Mem. Law in Supp. [ECF No. 34] ("Reply to Mot.");[2] Debtor Reply Affirm. Opp'n to Statement of Material Undisputed Facts [ECF No. 33] ("Debtor's Reply to Facts").

## BACKGROUND

### A. Debtor's Present Bankruptcy Case

On February 4, 2023 (the "Filing Date"), Debtor commenced this Chapter 7 bankruptcy case by filing a voluntary petition through counsel. Petition [Case No. 23-22095, ECF No. 1]

---

[1] Unless otherwise indicated, references in this Memorandum of Decision to docket entries on the Case Management/Electronic Case Files ("ECF") system are to Adv. Pro. 24-07009.

[2] As required by the applicable rules, the UST filed a Rule 7056.1 Statement of Undisputed Facts. Local Rule 7056-1(b). The Debtor's responses to the UST's Rule 56.1 Statement of Facts do not conform with the requirements of Local Rule 7056-1, which requires a party's response to include a "corresponding numbered paragraph responding to each numbered part of the statement of the moving party . . . ." Local Rule 7056-1(c). Instead, Debtor's responses appear to correlate with the UST's exhibits in which the Debtor superimposes his responses to each paragraph of the Motion for Summary Judgment and Trustee's Statement of Material Fact. *See* Debtor's Reply to Facts; Reply to Mot. Moreover, Debtor summarily disputes the majority of Plaintiff's proposed Statement of Undisputed Facts through argument rather than admitting or denying the facts. *See e.g.,* Debtor's Reply to Facts ¶ 55 (responding to Trustee Fact ¶ 85 ("In his Answer, the Debtor blamed others for his inability to explain aspects of his Schedules.") with "Debtor cannot be expected "explain aspects" of these complex filings."); *cf.* S.D.N.Y. Local Bankruptcy Rule 7056-1(d) ("Each numbered paragraph in the statement of material facts required to be served by the moving party shall be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.")

At the end of the day, the Court concludes that relevant facts in the record here are undisputed as to the information provided by the Debtor and the information that the Debtor has failed to provide, with the parties disagreeing upon the conclusions to be drawn from that record. The Court has cited to the Trustee Facts where not disputed and to the Debtor's numbered responses where appropriate.

(the "Petition"). Along with the Petition, Debtor filed schedules of assets and liabilities. *See id.* In the following weeks, Debtor filed amended schedules. *See* Schedules [Case No. 23-22095, ECF No. 5]; Am. Schedules [Case No. 23-22095, ECF No. 13] (together, as may be amended, supplemented, or modified, the "Schedules"); *see also* Pl.'s Statement of Material Undisputed Facts ¶ 3, [ECF No. 31-1] ("Trustee Facts"). Debtor also filed a Chapter 7 statement of current monthly income and means test calculation, and an amended statement of financial affairs. *See* Ch. 7 Means Test Calculation [Case No. 23-22095, ECF No. 6]; Am. Statement of Financial Affairs [Case No. 23-22095, ECF No. 10] (the "SOFA"). Under penalty of perjury, Debtor has declared that his debts are primarily consumer debts, as that term is defined in 11 U.S.C. § 101(8). Petition at 12.

The Debtor was initially represented in the Bankruptcy Case by attorney H.B. Bronson of Bronson Law Offices. *See* Petition at 13. Approximately one month after the Filing Date, Mr. Bronson filed an application to withdraw as counsel to the Debtor (the "Withdrawal Application"), citing various "negative comments" and alleging that the Debtor "questioned [the] Firm's integrity and morality." Mot. to Withdraw as Att'y ¶ 3 [Case No. 23-22095, ECF No. 18-1]. The Court granted the Withdrawal Application, and Mr. Bronson was discharged of his responsibilities as the Debtor's counsel. *See* Order Granting Mot. to Withdraw dated April 20, 2023 [Case No. 23-22095, ECF No. 32]. The Debtor has not retained new counsel since Mr. Bronson's departure, with Debtor instead proceeding *pro se* in both his Chapter 7 case and in this adversary proceeding.

**B. Information about the Debtor**

At this time of his petition, Debtor, his wife, and son all lived at 270 Victory Boulevard, New Rochelle, New York 10801 (the "New Rochelle Property"). Petition at 8; Compl. Ex. B

6:14-23 ("Jan. 2024 Dep. Tr."). Debtor owned and was employed by the Manchanda Law Office PLLC (the "Manchanda Law Firm"). *See* Schedules at 1 [ECF No. 5] (listing occupation and employment as an attorney at Manchanda Law Office PLLC); Am. Schedules at 4 [ECF No. 13] (reflecting the Debtor owns 100% of shares of the Manchanda Law Office PLLC). At the time of this filing of the Petition, Debtor was a practicing attorney; he was subsequently disbarred on November 1, 2024. *See Att'y Grievance Comm. for the First Jud. Dep't v. Manchanda (In re Manchanda)*, No. 23-05258 (App. Div. 1st Dep't Nov. 21, 2024). Debtor did not personally maintain books and records of his law firm business but instead has stated that such records were maintained by his accountant. *See* Trustee Facts ¶ 25; Debtor's Reply to Facts ¶¶ 22, 24–25. As of the beginning of 2024—shortly after this Chapter 7 case was filed—Debtor testified that 90 to 95 percent of his legal work was done at the New Rochelle Property. Jan. 2024 Dep. Tr. 7:11-18; *see also* Answer ¶ 22 ("I work on nearly every floor of the home law office."). Indeed, Debtor has deducted landscaping costs for the New Rochelle Property as a business expense. Reply to Motion ¶ 34 ("Maintenance of home law office property is also deductible or tax exempt as per our bookkeepers/CPAs/Accountants."). Notwithstanding Debtor's treatment of the New Rochelle Property as a business location, Debtor also has claimed the full homestead exemption of $179,975 in this bankruptcy for the New Rochelle Property.[3] *See* Am. Schedules at 7 [ECF No. 13].

On Schedule I, the Debtor states that his net monthly income from rental property and from his business or profession is $4,250 and, with the contribution of the income his non-filing

---

[3] The term "homestead exemption" refers to the dollar amount set by New York law applied to a principal residence that is exempted from the satisfaction of money judgments. *See* N.Y. C.P.L.R. § 5206(a). "Many States provide a homestead exemption that excludes a person's house and household items, up to a certain amount, from the liens of most creditors. The purpose of the exemption is to prevent debtors from becoming destitute." *Exemption*, Black's Law Dictionary (7th Ed. 1999). By claiming the New York homestead exemption, "[t]he first [$179,975.00] of the proceeds of any judicial sale held at the insistence of a . . . creditor be unavailable for any such creditor." *In re Giordano*, 177 B.R. 451, 455-56 (Bankr. E.D.N.Y. 1995).

spouse, the total monthly household income is $7,527.53. Schedules at 2 [ECF No. 5]. The Debtor's non-filing spouse is also listed as being employed by Manchanda Law Office PLLC. *Id.* at 1. Debtor claims that his monthly net expenses are $7,535.00, leaving a monthly deficit of negative $7.47. *Id*. at 4. Within his SOFA, Debtor lists his gross business revenue as being (1) $4,500 from January 1, 2023, through the Filing Date, (2) as $52,000 for the prior year (2022), and (3) as $51,999 for the year of 2021. SOFA at 1-2.

Debtor scheduled total assets of $871,601, including: (i) the New Rochelle Property valued at $845,265, (ii) a 2018 BMW 320i valued at $11,336, (iii) household goods and furnishings valued at $5,000, (iv) electronics valued at $2,000, (v) clothes valued at $2,000, (vi) jewelry valued at $5,800, (vii) cash on hand of $100, and (xiii) the full ownership of the Manchanda Law Firm valued at $100. *See* Am. Schedules at 1-6 [ECF No. 13]. Debtor does not identify any lease associated with the New Rochelle Property, nor does the Debtor list any business at the New Rochelle Property within his Schedules or SOFA. *See* Petition; Schedules.

Debtor signed each of his Petition, Schedules, SOFA, and Means Test Form pleadings under penalties of perjury. Petition; Schedules; Means Test Calculation; SOFA; Ch. 7 Statement of Current Monthly Income [Case No. 23-22095, ECF No. 7]. Throughout this adversary proceeding, however, Debtor has repeatedly stated that his Petition, Schedules, SOFA, and Means Test were all entirely the creation of his former counsel. *See e.g.* Debtor's Reply to Facts ¶ 4 (responding to Trustee Fact ¶ 2 ("Debtor also filed certain schedules of assets and liabilities") with "'Debtor' should read 'Debtor's attorney Bruce Bronson.'"). This is of particular note in connection with the value of his law firm. *See e.g.* May 16, 2023 Hr'g Tr. 27:6-9 [Case No. 23-22095, ECF No. 43] ("With regard to . . . my law firm valued at $100, my previous lawyer [] had done all these calculations. Again, [Manchanda Law is] owed $600,000 in unpaid legal fees after

15 years."). In response to the Trustee's contention that "Debtor . . . does not know why he signed Schedules valuing the Manchanda Law firm at $100," Debtor responded with "Debtor to this day has no reason to believe that Bruce Bronson and his expert valuation were inaccurate or incorrect, so he did not change them." *See* Trustee Facts ¶ 86; Debtor's Reply to Facts ¶ 56. By way of explaining his lack of knowledge, Debtor repeatedly has pointed to his inexperience in bankruptcy. *See e.g.* Answer ¶ 7 ("I have never been a bankruptcy attorney, only an immigration attorney for 22 years. . . . [M]any previous filings were either erroneous, misguided, or incomplete []if I even filed them . . ."); Answer ¶ 39 ("The Petition looked fine to me, but I am not a bankruptcy lawyer.").

At a hearing held on May 16, 2023—right after Debtor began appearing *pro se*—the Court advised Debtor that he could further amend the Schedules or SOFA if Debtor believed they needed amendments. *See* May 16, 2023 Hr'g Tr. 44:6-15 [Case No. 23-22095, ECF No. 43] (counseling the Debtor that "the idea is to get information and transparency. So if the number you think Mr. Bronson chose is incorrect, you should change that number and amend the schedules and information."); Trustee Facts ¶ 87. Notwithstanding that direction, Debtor has not filed any further amendments to the Schedules or SOFA. *See* Trustee Facts ¶ 88.

**C. The Small Business Administration ("SBA") Loan**

On or about July 21, 2020, the Debtor signed a loan authorization and agreement with the U.S. Small Business Administration on behalf of the Manchanda Law Firm (the "Loan Agreement"), which provided for loan proceeds of $500,000 to the Manchanda Law Firm (the "SBA Loan"). *See* Decl. in Supp. UST's Mot. Summ. J. ("Zipes Declaration") Ex. J ("SBA Loan Documents") [ECF No. 31-2]; Trustee Facts ¶¶ 64–65. The loan initially provided $150,000; a little more than one year later in November 2021, an additional $350,000 was extended under a

modification. SBA Loan Documents at UST-000106. Under the Loan Agreement, the Debtor as borrower undertook certain obligations, including but not limited to the following:

- Borrower will use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter . . .

- Borrower will obtain and itemize receipts (paid receipts, paid invoices or cancelled checks), and contracts for all Loan funds spent and retain these receipts for 3 years from the date of the final disbursement. . . .

- Borrower will not use, directly or indirectly, any portion of the proceeds of this Loan to relocate without the prior written permission of SBA. . . .

*See* SBA Loan Documents at UST-000049; Trustee Facts ¶¶ 66–68. Failure to comply by these obligations exposes the Debtor to both civil and criminal liability. *See* SBA Loan Documents at UST-000052 ("Whoever wrongfully misapplies the proceeds of a SBA disaster loan shall be civilly liable . . . any false statement or misrepresentation to SBA may result in criminal, civil, or administrative sanctions . . . ").

Debtor individually guaranteed the SBA Loan. *See* Trustee Facts ¶¶ 66 & 69; SBA Loan Documents at UST-000059 & UST-000060. Debtor's digital signature is attached to the Loan Agreement, although the Debtor states that he does not recall signing the SBA Loan and that his financial advisors "handle[d] any and all SBA government loans for compliance." Debtor's Reply to Facts ¶ 44; SBA Loan Documents UST-000060.

The record is unclear as to exactly what money was used to purchase the New Rochelle Property. The UST contends that proceeds of the SBA Loan were used to purchase the New Rochelle Property. Motion at 27 n.5 ("[T]he United States Trustee is prepared to show the transfers of the proceeds of the SBA Loan through multiple bank accounts before finally arriving at the closing of the New Rochelle Property"). More specifically, the UST points to a "Universal Withdrawal" receipt from the M&T bank account associated with the Manchanda Law Firm on

July 6, 2022, showing a $180,157.27 withdrawal (the "$180,157.27 Withdrawal"), which was used for purchasing the New Rochelle Property. *See* Zipes Decl. Ex. M ($180,157.27 Withdrawal); Trustee Facts ¶¶ 71-72; Debtor's Reply to Facts ¶ 48. Debtor states at one point that he and his wife—not the Manchanda Law Firm—individually purchased the New Rochelle Property in 2022. *See* Trustee Facts ¶¶ 74, 75; Debtor's Reply to Facts ¶ 50 ("A small business home law office was [purchased] on or about July 6, 2022, by Debtor and his fully salaried, employee-tax paying, Law Office Manager . . . ."); Reply to Mot. ¶ 69 (Debtor's wife is the Law Office Manager). But at another point, the Debtor asserts instead that the Universal Withdrawal was "a mix of our own money plus law firm operating money used for law firm office purposes." Reply to Motion ¶ 67.

**D. Discovery**

In mid-April 2023, the UST filed an application under Bankruptcy Rule 2004, seeking an order directing the Debtor to produce certain documents and to appear for an examination regarding, among other things, his liabilities, financial conditions, and matters that may affect the administration of his bankruptcy estate or to his right to a discharge (the "2004 Application"). App. of UST pursuant to Bankr. R. 2004 for Order Directing the Exam. of the Debtor and Production of Documents and Extending Deadlines to Move to Dismiss and Object to Discharge [Case No. 23-22095, ECF No. 30]. Over the objection of the Debtor, the Court entered an order granting the UST's 2004 Application. Order dated June 1, 2023 Directing the Production of Documents [Case No. 23-22095, ECF No. 45] (the "2004 Order"); *see also* Mot. in Opp'n [Case No. 23-22095, ECF No. 37]. Debtor was required to produce certain documents and information to the UST within twenty-one days from the date of entry of the 2004 Order (i.e., no later than June 22, 2023). *See* 2004 Order ¶ 5. The Debtor produced some, but not all, of the documents

requested on a rolling basis on the following dates: May 30, 2023; June 24, 2023; July 18, 2023; and August 6, 2023. *See* Trustee Facts ¶ 49; Compl. Ex. D (the "Document Production Chart"); Zipes Decl. Ex. A (incorporating the Complaint and its exhibits in support of Plaintiff's Motion for Summary Judgment).

The United States Trustee's Office created the Document Production Chart to memorialize the Debtor's responses to the 2004 Order and sent it to the Debtor for review in advance of Mr. Manchanda's scheduled examination. *See* Document Production Chart; Motion Ex. A. Debtor explains that he did not make comments or changes to the Document Production Chart because it "looked like Chinese to him." Debtor's Reply to Facts ¶ 41. The Document Production Chart reflects that Debtor has failed to produce any documents in response to the requests about valuation of his assets, how he calculated his income, any recent applications for credit, his debts, and recent debts or transfers to or from the Debtor. Specifically, the Debtor was requested to—but did not—produce:

> 2) All documents relating to the valuation of the Manchanda Law Office PLLC provided in the schedules. . . .
>
> 4) All documents showing how the Debtor calculated income on Schedule I [ECF Docket No. 5]. The Debtor indicates on Schedule I that his net income from "rental property and from operating a business, profession, or farm" is $4,250. After including the income of "Debtor 2 or non-filing spouse" the total monthly income is $7,527.53. The Debtor should provide all documents in connection with the income amounts listed in Schedule I.
>
> 5) All documents relating to applications for credit, loans, or letters of credit submitted by the Debtor to credit or financial institutions for two (2) years prior to the Filing Date, as well as all documents relating to applications for credit, loans, or letters of credit submitted by the Debtor with respect to all outstanding credit or loan obligations existing at or after the time to the Filing Date to the present.
>
> 6) Monthly statements for all debts listed in the Schedules, including those listed in Schedule D, E, and F for the two (2) years prior to the date of filing of the Petition. . . .

> 14) All documents relating to gifts or transfers made to or from the Debtor having a value in excess of $100.00 for the past two years and, if documents do not exist for any such gift, a description of the item purchased and to whom such item was presented.

Document Production Chart. In response to the allegation that he failed to maintain and produce records, Debtor responds that he has "submitted everything to the best of our ability and speed . . ." and has "provided everything that we had, or could get." Answer ¶¶ 14 & 16.[4]

The Debtor's initial examination under Bankruptcy Rule 2004 was held September 20, 2023 (the "September Examination") via Zoom under penalty of perjury. *See* Trustee Facts ¶¶ 55, 56; Zipes Decl. Ex. O ("Sept. Dep. Tr."). At the examination, the Debtor refused to answer certain standard questions about his bankruptcy filings. *See e.g.*, Sept. Dep. Tr. 31:29–32:24.[5] The September Examination was not completed. *See* Reply in Connection with Mot. to Extend Time ¶ 5 [Case No. 23-22095, ECF No. 68]. After several failed attempts to finish his examination,[6] the Debtor's continued examination was eventually held and completed on January 26, 2024. *See* Trustee Facts ¶ 63.

**E. Prior Bankruptcy Filings by the Debtor and the Debtor's Law Firm**

Debtor has filed four prior individual bankruptcy petitions. The Debtor filed his first individual case in October 2011, under Chapter 7 of the Bankruptcy Code, which was dismissed

---

4 In later 2023, the Court also authorized the United States Attorney's Office—over the Debtor's objection—to subpoena information about the Debtor's finances directly from TD Bank, N.A., Citibank, N.A., and M&T Bank. *See* United States' Motion to take Discovery pursuant to Fed. R. Bankr. P. 2004 [Case No. 23-22095, ECF No. 80] (the "AUSA 2004 Application"); Order Permitting Discovery [Case No. 23-22095, ECF No. 93].

5 When asked if he signed his bankruptcy petition, the Debtor took issue with the term "wet signature" and suggested that the signed petition may have been fabricated by his counsel. Sept. Dep. Tr. 31:9–32:24 ("You asked me if I signed with a wet signature. I don't see it in front of me . . . It's a printed signature. That looks like Bruce Bronson did that. . . . Show me my signature on something, my wet signature. I can attest that it's my signature or not. But I can't attest to just a blank document with a typewritten signature, which I'm assuming is Bruce Bronson.").

6 The Debtor agreed to, but did not appear at, the continued examination on November 6, 2023. *See* Nov. 7, 2023 Hr'g Tr. 3:2-8 [Case No. 23-22095, ECF No. 84]. The Debtor also failed to appear at a Zoom conference scheduled to consider discovery issues held the following day on November 7, 2023. *See id.*

in early January 2012 for failure to provide various required information. Order Granting Automatic Dismissal dated January 18, 2012 [Case No. 11-14666-smb, ECF No. 33]. In early September 2013, the Debtor filed a second *pro se* petition under Chapter 7 and received a standard Chapter 7 discharge in January 2014. Discharge of Debtor Order of Final Decree [Case No. 13-12880-mg, ECF No. 64]. In that case, Debtor filed a set of schedules swearing under penalty of perjury that his debts were primarily business debts and estimating the value of various personal property. Petition at 1, 3, 8, 24, & 40 [Case No. 13-12880, ECF No. 1]. Four months later, the Debtor filed a third case under Chapter 13, which he voluntarily dismissed in January 2015. *See* Order Granting Debtor's Mot. Req. Voluntary Dismissal dated January 7, 2015 [Case No. 14-11259-jlg, ECF No. 32]. The following year, Debtor filed yet another Chapter 13 petition which was also ultimately dismissed voluntarily. Order Granting Dismissal of Chapter 13 Case dated January 27, 2017 [Case No. 16-10222-jlg, ECF No. 187]. In this fourth bankruptcy case Debtor listed on his schedule of assets a 100% ownership interest in his law firm, the Manchanda Law Firm, as worth negative $1,545.75. Schedules A/B [Case No. 16-10222-jlg, ECF No. 27].

The Manchanda Law Firm has also filed several bankruptcy petitions. Its first petition was filed *pro se* under Chapter 7 in December 2011; the case was fully administered and closed in February 2012. Order of Final Decree dated February 25, 2012 [Case No. 11-15837-smb, ECF No. 10]. In that filing, the Manchanda Law Firm schedules included "approximately $2,000,000" in accounts receivable. Petition at 8 [Case No. 11-15837-smb, ECF No. 1]. In November 2023, the Manchanda Law Firm filed a second petition under Chapter 7. *See* Case No. 23-11805 (the "Second Manchanda Law Bankruptcy"). The Second Manchanda Law Bankruptcy schedules identified $253,217 in accounts receivable. Petition at 9 [Case No. 23-

11805, ECF No. 1]. While the Second Manchanda Law bankruptcy case was still open and pending, the Manchanda Law Office & Associates PLLC filed a third Chapter 7 petition on September 3, 2025. *See* Petition [Case No. 25-22828, ECF No. 1] (the "Third Manchanda Law Filing"). The Third Manchanda Law Filing schedules listed as assets $106,275.02 in accounts receivable and a "mortgage" interest in the property located at New Rochelle Property. *Id*. at 7 & 11.

**F. Additional Background regarding Debtor's Conduct**

The record before the Court would not be complete without noting that the Debtor has a history of vexatious litigation. *See* Order on Pending Matters [Case No. 23-22095, ECF No. 158] (striking a series of contempt motions filed by the Debtor and cautioning the Debtor from "filing pleadings that lack a basis in fact or law," and stating that "filing such pleadings will render him subject to possible sanctions under Rule 9011 of the Federal Rules of Bankruptcy Procedure and 28 U.S.C. § 1927, up to and including a filing ban."); *see also Manchanda v. Matties*, 2020 WL 1940668, at *3 (S.D.N.Y. Apr. 22, 2020) ("In recent years, numerous lawsuits brought by [Mr. Manchanda] have been dismissed as frivolous.") (listing cases); *see id*. at *3 ("[Manchanda] has repeatedly been warned that he will be barred from filing suit in this District if he continues to file frivolous actions."); *Manchanda v. Attorney Grievance Comm. for the First Judicial Dep't*, 2023 WL 3091787, at *2 (S.D.N.Y. Apr. 26, 2023) (noting that Mr. Manchanda has been "warned [that] the continued filing of frivolous or meritless lawsuits would result in an order . . . barring [him] from filing any new action in this Court without prior permission"). Given his history of vexatious conduct, including a lawsuit against the Court and members of chambers, the Debtor has been barred from filing further litigation in the Southern District of

New York without first seeking court approval. *See Manchanda v. Walsh*, 2024 WL 455204 at *6-9 (S.D.N.Y. Feb. 5, 2024), *appeal dismissed*, 2024 WL 5412393 (2d Cir. Sept. 25, 2024).

## DISCUSSION

### A. Summary Judgment

Federal Rule of Civil Procedure 56, made applicable by Rule 7056 of the Federal Rules of Bankruptcy Procedure, governs the standard for granting of summary judgment. *See* Fed. R. Civ. P. 56; Fed. R. Bankr. P. 7056. "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the [movant] is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). If "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

"A fact is 'material' when it 'might affect the outcome of the suit under governing law.'" *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (citing *Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986))). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48. "The Court may also grant some but not all of the relief requested in a summary judgment motion if it finds disputed issues of fact as to some of the issues presented." *In re Residential Capital, LLC*, 533 B.R. 379, 395 (Bankr. S.D.N.Y. 2015) (citing Fed. R. Civ. P. 56(g)).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [the movant's] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir. 1995). The showing necessary to satisfy this initial burden depends on which side bears the burden of proof on a particular issue at trial. *See Read Prop. Grp. LLC v. Hamilton Ins. Co.*, 2018 WL 1582291, at *5 (E.D.N.Y. Mar. 30, 2018). When the movant has the burden of proof at trial, its own submissions in support of the motion must entitle it to judgment as a matter of law. *Id.*; *see also Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998). To avoid summary judgment, the nonmoving party must then come forward with evidence sufficient to raise a genuine issue of fact for trial. *See Albee Tomato Inc.*, 155 F.3d at 618 (denying summary judgment where the movants affidavit contained only statements that "might" rather than "compel" a trier of fact to a conclusion). Evidence submitted at summary judgment remain "subject to the same rules that govern the admissibility of evidence at trial." *eCommission Solutions, LLC v. CTS Holdings Inc.*, 860 Fed. App'x. 758, 761 (2d Cir. 2019) (internal citation omitted); *Walker v. Carrozzo*, 664 F. Supp.3d 490, 504 (S.D.N.Y. 2023) ("When ruling on a motion for summary judgment, a [] court should consider only evidence that would be admissible at trial."). Parties making a factual assertion must support that assertion with competent evidence. Fed. R. Civ. P. 56(c)(1) ("A party . . . must support the assertion by: (A) citing to particular parts of materials in the record . . . "). Unsworn declarations or statements may be considered, "but only if the declarant affirms, under the penalty of perjury, that the contents of the unsworn statements are true." *Waddlington v. City of New York*, 971 F. Supp.2d 286, 292 (E.D.N.Y. 2013) (citations omitted).

When deciding whether material factual issues exist, all ambiguities must be resolved and all reasonable inferences must be drawn in favor of the nonmoving party. *Matsushita*, 475 U.S. at 587 (quoting *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). However, "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation[,]" *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

It is well established that "[t]he nonmovant . . . cannot create a genuine issue of fact and defeat summary judgment through 'conclusory allegations, conjecture, and speculation.'" *Mishkin v. Gurian (In re Adler, Coleman Clearing Corp.)*, 399 F. Supp. 2d 486, 490 (S.D.N.Y. 2005) (quoting *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998)). Further, a trial court is not required to "wade through improper denials and legal argument in search of a genuinely disputed fact." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528–29 (7th Cir. 2000); *see also In re Gutierrez*, 528 B.R. 1, 8 (Bankr. D. Vt. 2014) (identifying deficiencies in the other side's material facts, while also failing to present significant probative evidence that a genuine dispute of fact exists, fails to establish a genuine dispute of fact). Allegations requiring a responsive pleading that are not properly and substantively denied are instead considered to be admitted. *See* Fed. R. Bankr. P. 7008 (incorporating Fed. R. Civ. P. 8 in adversary proceedings); Fed. R. Civ. P. 8(b).

"[P]ro se status does not insulate a party from complying with procedural and substantive law." *In re Flynn*, 582 B.R. 25, 31 (B.A.P. 1st Cir. 2018) (quoting *Ahmed v. Rosenblatt*, 118 F.3d 886, 890 (1st Cir. 1997); *see also Gittens v. Garlocks Sealing Techs*., 19 F. Supp. 2d 104, 110

(W.D.N.Y. 1998) (collecting cases). *Pro se* litigants must follow the same rules that govern other litigants. *See FDIC v. Anchor Props.*, 13 F.3d 27, 31 (1st Cir. 1994) ("We have consistently held that a litigant's '*pro se* status [does not] absolve him from compliance with [procedural rules].'") (quoting *United States v. Heller*, 957 F.2d 26, 31 (1st Cir. 1992)); *Stinson v. Sheriff's Dep't of Sullivan Cnty.*, 499 F. Supp. 259, 262 (S.D.N.Y. 1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended"). While *pro se* litigants are typically afforded a "special solicitude," debtors who are attorneys—even those recently disbarred—are not entitled to such solicitude. *In re Kossoff PLLC*, 816 F. Supp.3d 403, 412 (S.D.N.Y. 2026) (citing *Salis v. Dopico*, No. 24-1066-cv, 2025 WL 880407, at *1 (2d Cir. Mar. 21, 2025)).

Finally, the Court may take judicial notice of proceedings in the underlying bankruptcy case for purposes of its decision in this adversary proceeding. *See In re AMR Corp.*, 567 B.R. 247, 250 n.2 (Bankr. S.D.N.Y. 2017), *aff'd sub nom Krakowski v. Am. Airlines, Inc.*, 610 B.R. 714 (S.D.N.Y. 2019*), aff'd sub nom In re AMR Corp.*, 834 F. App'x 660 (2d Cir. 2021); *Messer v. Wei Chu (In re Xiang Yang Gao)*, 560 B.R. 50, 55 n.4 (Bankr. E.D.N.Y. 2016) (taking judicial notice of relevant documents filed in debtor's bankruptcy case and related adversary proceedings) (citing cases); *cf. Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 96 n.17 (S.D.N.Y. 2004) ("The Court can take judicial notice of matters of public record . . . including filings in related lawsuits. . . .").

**B. Section 727 on Nondischargeability**

"Chapter 7 of the Bankruptcy Code is designed to provide individual debtors the opportunity for a 'fresh start' through the discharge of personal liability for pre-petition debts." *In re Gasson*, 2018 WL 6603737, at *10 (Bankr. S.D.N.Y. Dec. 13, 2018). To that end, Section

727(a) provides that the Court shall grant the debtor a discharge unless one of the exceptions enumerated in the statute applies. 11 U.S.C. § 727(a). Because a denial of discharge is a harsh sanction, Section 727(a) "must be construed strictly against those who object to the debtor's discharge and liberally in favor of the bankrupt." *Gordon v. Tese-Milner (In re Gordon)*, 535 B.R. 531, 536 (S.D.N.Y. 2015) (quoting *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996) (internal quotation marks omitted)). At the same time, "the discharge of a bankrupt from his debts is a privilege . . . that has been granted by Congress upon such terms as it has seen fit to impose," and "[a]mong these terms is the requirement that debtors act in good faith and provide full and honest disclosure." *Gordon*, 535 B.R. at 536 (internal citations omitted). A plaintiff bears the burden of proving by a preponderance of the evidence that a discharge should be denied based on one or more of the exceptions set forth in the statute. *See id*. (internal citation omitted).

The UST invokes three provisions for exception to discharge under Section 727 in its complaint: 727(a)(3), (a)(4), and (a)(5). The UST need only prevail on one of the three to deny a discharge. *See HSBC Bank USA v. Handel (In re Handel)*, 266 B.R. 585, 588 (Bankr. S.D.N.Y. 2001).

I. <u>Section 727(a)(3) as to Debtor's Failure to Maintain Books and Records</u>

A court must deny a discharge under Section 727(a)(3) if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained," unless justified. 11 U.S.C. § 727(a)(3). "The purpose and intent of [this section] is to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs." *In re Underhill*, 82 F.2d 258, 260 (2d Cir. 1936). This section

also ensures that creditors are supplied with dependable information on which they can rely in tracing a debtor's financial history. *See Krohn v. Frommann (In re Frommann)*, 153 B.R. 113, 116 (Bankr. E.D.N.Y. 1993) (internal citations omitted).

For a plaintiff to successfully object to a discharge under Section 727(a)(3), the plaintiff must show that: "(1) [the] debtor failed to keep or preserve books and records from which the debtor's financial condition or business transactions might be ascertained, and (2) this failure makes it impossible to determine the debtor's true financial condition." *Moreo v. Rossi (In re Moreo)*, 437 B.R. 40, 51 (E.D.N.Y. 2010) (citing *D.A.N. Joint Venture v. Cacioli (In re Cacioli)*, 463 F.3d 229, 235 (2d Cir. 2006)). "[A]lthough [Section] 727(a)(3) focuses on records relating to the debtor's personal financial affairs, his failure to keep adequate financial records regarding the business transactions of a closely held corporation that are necessary to determine his personal financial affairs may result in the denial of a discharge." *Stillwater Liquidating LLC v. Gray (In re Gray)*, 2016 WL 1039559, at *3 (Bankr. S.D.N.Y. Mar. 15, 2016) (citing *Beach Lane Mgmt., Inc. v. White (In re White)*, 2015 WL 9274771, at *3 (Bankr. S.D.N.Y. Dec. 18, 2015) (collecting cases)).

The "impossibility element [of prong two] does not require that the creditors examine all records and documents produced and prove that the debtor's financial condition cannot be ascertained from those records." *Bronfman v. O'Hara (In re O'Hara)*, 2013 WL 1751001, at *7 (N.D.N.Y Apr. 23, 2013) (citing *Strezesynski v. Devaul (In re Devaul)*, 318 B.R. 824, 831 (Bankr. N.D. Ohio 2004)). "Rather, the focus is on the documents that have not been provided by the debtor and whether it would be unduly burdensome or impossible to ascertain the debtor's financial condition or material business transactions without them." *Bronfman*, 2013 WL 1751001, at *7 (citing *Casa Invs. Co. v. Brenes (In re Brenes)*, 261 B.R. 322, 330 (Bankr. D.

Conn. 2001)). "[A] debtor is the gatekeeper of this information and the '[c]ourts and creditors should not be required to speculate as to the financial history or condition of the debtor, nor should they be compelled to reconstruct the debtor's affairs.'" *Bronfman*, 2013 WL 1751001, at *7 (quoting *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996)). Once the plaintiff has successfully established that the debtor has failed to maintain his or her records, the burden shifts to the debtor to justify their absence. *See In re Cacioli*, 463 F.3d at 235; *In re Sandow*, 151 F.2d 807, 809 (2d Cir. 1945).

Applying these standards here, the Court concludes that the UST has satisfied the elements for nondischargeability under Section 727(a)(3). The crux of the UST's argument under Section 727(a)(3) is the Debtor's lack of response to requests for documents on key certain financial details. More specifically, the 2004 Order required Debtor to produce certain documents and information to the UST within twenty-one days from the date of entry of the 2004 Order (i.e., no later than June 22, 2023). *See* 2004 Order. In the Motion, Plaintiff alleges the Debtor produced some, but not all, of the required documents in a rolling production. *See* Motion ¶ 54. In response to the Debtor's failure, the Plaintiff created the Document Production Chart to identify what documents that the Debtor produced in response to each request and where the Debtor failed to provide any documents in response to a request. Motion ¶¶ 54-56 (noting the Debtor's failure to produce documents as reflected in the Document Production Chart); Zipes Decl. ¶ 16 (explaining that the Debtor failed to produce documents as reflected in the Document Production Chart, including evidence explaining the $ 100 valuation of his law firm); AUSA 2004 Application (explaining the Debtor's failure to produce requested documents resulted in the UST's application to issue subpoenas to third parties to obtain the needed

documents). As the Document Production Chart sets forth, the Debtor failed to turnover, among other things:

- any documents showing how Debtor calculated income on Schedule I;
- any documents relating to applications for credit, loans or letters of credit for the two years prior to the Filing Date; and
- any monthly statements for all debts listed in the Schedules for the two years prior to the Filing Date.

*See* Document Production Chart; *see also* AUSA 2004 Application (noting that Debtor did not provide "sufficient documentation relating to the $500,000 SBA loan that his law firm received or about the source of the funds that he used to purchase his home in July 2022.").

Without these documents, it is impossible to know the basis for key financial representations made by the Debtor in this case as to his income, debts and assets. *See* 11 U.S.C. § 521(a) (setting forth the obligation to file certain schedules and lists detailing a debtor's financial condition, including a list of creditors, a schedule of assets and liabilities, a statement of current income and current expenditures, and a statement of financial affairs). Such bankruptcy reporting is "vital to a bankruptcy proceeding" because this information

> Provide[s] a recent financial history of the debtor as well as a list of its assets, liabilities and contractual obligations. These forms are the debtor's representations of its own financial condition at the start of the case. They are signed under penalty of perjury. They are critically important and must be accurate, since the information will be relied upon by all parties . . . .

1 *Collier Trustees & Debtors in Possession* ¶ 20.05(23) (2023) (quoted in *In re Guiliani*, 661 B.R. 493, 501-502 (Bankr. S.D.N.Y. 2024)).

Having failed to keep or provide the appropriate financial records, the burden shifts to the Debtor to justify their absence. *See In re Cacioli*, 463 F.3d at 235; *In re Sandow*, 151 F.2d at 809. Courts have examined the following factors in determining whether a debtor is justified in failing to produce adequate records for the type of business in which he was involved:

> (1) Whether the debtor was engaged in business, and if so, the complexity and volume of the business;
> (2) The amount of the debtor's obligations;
> (3) Whether the debtor's failure to keep or preserve books and records was due to the debtor's fault;
> (4) The debtor's education, business experience and sophistication;
> (5) The customary business practices for record keeping in the debtor's type of business;
> (6) The degree of accuracy disclosed by the debtor's existing books and records;
> (7) The extent of any egregious conduct on the debtor's part; and
> (8) The debtor's courtroom demeanor.

*In re Cacioli*, 463 F.3d at 235 n. 8 (citing *State Bank of India v. Sethi (In re Sethi)*, 250 B.R. 831, 838 (Bankr. E.D.N.Y. 2000)); *see also In re Moreo*, 437 B.R. at 51 (citing to the eight *Sethi* factors in determining whether debtor's failure to keep books was justified).

Turning to the Debtor's position, the Debtor does not actually dispute the UST's statements about his failure to produce documents that he has failed to produce, instead stating generally to have "submitted everything to the best of our ability and speed." Answer ¶ 14; Reply to Facts ¶¶ 21-22 (noting that Debtor sent his documents to his accountant and that Debtor has records in storage that the UST can go retrieve). Debtor further explains that he did not make any changes to the Document Production Chart because "he did not understand it—looked like Chinese to him." Debtor's Reply to Facts ¶ 41. He further blames any failure to produce documents or errors in his bankruptcy filings on his former attorney Mr. Bronson. *See, e.g., id.* ¶¶ 54-55 (noting that he hired Mr. Bronson and other professionals to prepare his petition and schedules and "should be allowed to rely on their work") *but see id*. at ¶ 56 (Debtor stating that he did not change anything filed by his attorney because "Debtor to this day has no reason to believe . . .[his filings] were inaccurate or incorrect"); Reply to Motion ¶ 42 (where Debtor states he "did not 'value' [his sole proprietorship on Debtor's SOFA], Bruce Bronson's experts 'valued'

that"). But as discussion of these factors below demonstrate, however, none of these arguments—nor anything else presented by the Debtor—justifies his failures here.

As to the first and fifth factors, the Debtor's business and its related record keeping obligations do not excuse his failure here. Indeed, they reinforce the problematic nature of his failure. The Debtor operated a law firm with significant income and expenditures, with Manchanda Law Firm historically generating gross income ranging from $50,000 to $150,000 per month. *See* Answer ¶ 32.[7] Moreover, the Debtor failed to follow customary business practices for recordkeeping for an attorney, especially one who owns his own law firm. The New York Professional Conduct Rule 1.15(d) provides that "a lawyer *shall* maintain for seven years after the events that they record: the records of all deposits in and withdrawals from [. . .] any other bank account that concerns or affects the lawyer's practice of law . . . ." N.Y. R. Prof. Conduct 1.15(d) (emphasis added). This Rule specifies further that "these records shall specifically identify the date, source and description of each item deposited, as well as the date, payee, and purpose of each withdrawal or disbursement . . . ." *Id.* The Debtor failed to produce records that should exist based on the requirements, including documentation on how he arrived at the gross revenue of his business, his net income, the valuation of his law firm, and documents relating to applications of credit or loans. As courts have recognized, it is not enough for a debtor to state "that he did not comprehend the need for" keeping records or "that is not his practice to keep business records" where other similar businesses would ordinarily keep financial

---

[7] The fact that the Manchanda Law Firm was a sole proprietorship is of no relevance here. *See In re Moreo*, 437 B.R. 40, 52 (E.D.N.Y. 2010) ("the fact that a business is small does not, by itself, justify failure to keep records."); *see also Meridian Bank v. Alten*, 958 F.2d 1226, 1232 (3d Cir. 1992); *Baker v. Trachman*, 244 F.2d 18, 20 (2d Cir. 1957).

records. *In re Moreo*, 437 B.R. at 52 (citing *Bay State Milling Co. v. Martin (In re Martin)*, 141 B.R. 986, 997 (Bankr. N.D. Ill. 1992)). Indeed, debtors such as Mr. Manchanda have a duty

> to preserve those records that others in like circumstances would ordinarily keep . . . . Hence, the debtor's honest belief that he does not need to keep the records in question, or that his records are sufficient, or his statement that it is not his practice to keep additional records, does not constitute justification for failure to keep or preserve records under §727(a)(3).

*Id.* at 53 (citing *In re Sethi,* 250 B.R. at 839). In any event, the Debtor here was aware of the relevant record keeping requirements of a practicing lawyer. *See* Zipes Decl. Ex. F (Debtor's email to his former real estate attorney reminding him that "As a lawyer you are mandated to keep client files for 7 years.").

As to the second factor, the amount of the Debtor's obligations for which records are missing are significant. In this case, the Debtor scheduled $1.5 million in liabilities; with $835,055 in secured debt and $666,175.00 in unsecured debt. *See* Schedules. The magnitude of these liabilities and disparity in schedules underscore the need for accurate and accessible records. The significance of the Debtor's obligations is reinforced by the information known about the Debtor's business, which is also in bankruptcy in this Court and was the Debtor's source of income in this individual case. In the Second Manchanda Law Bankruptcy,[8] the Debtor scheduled $31,413.00 in total liabilities, all unsecured. Petition at 7, Case No. 23-11805 [ECF No. 1]. But in fact, creditors of the law firm case filed proof of claims including $416,983.02 in secured debt—comprised primarily of a $373,759.84 claim by the Internal Revenue Service ("IRS")—and over $1 million in unsecured debt, including a $527,508.96 claim

[8] The Second Manchanda Law Filing provides the most robust financial picture of the firm. The schedules in the more recent Third Manchanda Law Filing only provide estimates in value of the assets, and the scheduled liabilities remain largely unvalued but contain many of the same creditors as the Second Manchanda Law Filing. *See* Petition [Case No. 25-22828, ECF No. 1].

by the SBA and the remaining $428,669.60 unsecured portion of the IRS's claim. *See* Claim Nos. 1-5, 6-1, Case No. 23-11805.

As to the third factor, the Debtor contends that he outsourced the job of keeping his records and details about his financial picture to accountants, and then later to his bankruptcy attorney.[9] Rather than turning over his relevant records, the Debtor claimed that his books and records are "'in storage at 'Piece of Cake' moving and storage in New York City, and AUST Zipes is still free to go whenever he chooses.'" Reply to Trustee Facts ¶ 21. But that is not the law. A debtor in bankruptcy has the obligation to provide details of his financial status under penalty of perjury. *In re Kelton*, 389 B.R. 812, 818 (Bankr. S.D. Ga. 2008) ("Accurate disclosure of a debtor's financial situation is perhaps the primary duty of debtors seeking relief under the Bankruptcy Code."); *c.f. Darwin (Huck) Spaulding Living Trust v. Carl (In re Carl)*, 517 B.R. 53, 70 (Bankr. N.D.N.Y 2014) ("[R]eliance [on counsel] must be in good faith."); *In re Bello*, 528 B.R. 562, 568 (Bankr. E.D.N.Y. 2015) ("[C]lients must be held accountable for the acts and omissions of their attorneys.") (internal citations omitted); *In re Feldman*, 597 B.R. 448, 459-60 (Bankr. E.D.N.Y. 2019) (finding bad faith where a debtor who blamed his incomplete and inaccurate filings on his counsel). Thus, the Debtor cannot simply outsource his record keeping and production obligations. *See In re Craig*, 252 B.R. 822, 828 (Bankr. S.D. Fla. 2000) (holding that a debtor cannot meet his § 727(a)(3) obligations by telling creditors where they might obtain records; he must affirmatively produce them); *In re Gormally*, 550 B.R. 27, 53–54 (Bankr. S.D.N.Y. 2016) (finding egregious conduct where a debtor failed to produce books and records

---

[9] The Debtor argues that he is "not a bankruptcy lawyer, but rather an immigration lawyer." Reply to Motion ¶ 78. He states that he does not "hav[e] any real knowledge of the intricacies of the [B]ankruptcy [C]ode or the internal revenue code [and] could offer nothing in terms of 'amendments, changes, schedules.'" *Id*. at ¶ 77.

and took the position that maintaining such records was "not his problem" but rather "the problem of his creditors," and told plaintiffs to "look up my records").

Given his failure to provide the required records, both the UST and United States Attorney's Office had to subpoena the Debtor's business and personal bank accounts; they obtained bank statements and other financial records from other sources because the Debtor failed to provide records of significant transactions and relevant finances. *See* AUSA 2004 Application. Even with these efforts by the Government, there are insufficient records to address basic financial questions here. For example, the UST complains specifically about the lack of details as to the $180,157.27 Withdrawal where the Debtor supposedly used SBA loan funds for the closing costs and/or down payment of the New Rochelle Property. *See* Trustee Facts ¶ 71-72; Debtor's Reply to Facts ¶ 48. Little to no documents were provided by the Debtor to reflect the source of this money, with the Debtor offering only his own conclusory and vague narrative explanation that these funds were "a mix of our own money plus law firm operating money." *See* Reply to Motion ¶ 67; Document Production Chart (reflecting the Debtor provided only four documents (UST-000035 through UST-000039) in response to the UST's request for "[a]ll documents relating to the purchase, maintenance, or valuation [of the New Rochelle Property] including any (i) appraisals, (ii) closing documents, (iii) receipts, and (iv) confirmation(s) of mortgage and tax payments, with the name of the payor, related to such property."); Zipes Decl. Ex. K (UST-000035-UST-000039) (a closing disclosure for the New Rochelle Property).

As to the fourth factor of the Debtor's level of education and experience, the Debtor was a sophisticated lawyer with an incentive to maintain and safeguard books and records, presumably with an appreciation of the importance of maintaining such records, as a matter of both professional responsibility and legal obligation. *See* Schedule I [ECF No. 5]. Courts assess

the adequacy of a debtor's record-keeping in relation to the debtor's occupation, education, experience, and sophistication. *See In re Strbac*, 235 B.R. 880, 882 (B.A.P. 6th Cir. 1999). Given his background and stated experience, the Debtor's excuse of ignorance of basic recordkeeping requirements fails.

Regarding the sixth factor addressing the degree of accuracy disclosed by the existing books and records, the limited records the Debtor did provide were inadequate to "allow the Trustee, the creditors, and the court to meaningfully reconstruct debtor's financial status." *Moreo*, 437 B.R. at 58 (E.D.N.Y. 2010) (citing *In re Goldstein,* 123 B.R. 514, 525 (Bankr. E.D. Pa. 1991)). As discussed above, the UST and U.S. Attorney were forced to reconstruct pieces of the Debtor's finances through third party subpoenas. *See* Trustee Facts ¶¶ 53–54; 2004 Application; AUSA 2004 Application. Even after these efforts, the UST asserts that material transactions such as the $180,157.27 Withdrawal were neither explained nor supported by documentation. *See* Motion at 27. The Debtor's "head in the sand" approach is precisely what Section 727(a)(3) was designed to prohibit.

Concerning the seventh factor, the Court finds that the Debtor's lack of transparency to be egregious given his education, profession, and his prior experience in filing numerous bankruptcy cases for himself and his law firm. In addition to his failure to provide relevant documents, the Debtor has also failed to separate his personal and business accounts. For example, he has claimed that certain expenses—for example, Green Village Landscaping, Inc.—were business expenses. *See* Trustee Facts ¶ 27; Reply to Motion ¶ 34. But as the Debtor has stated, "[d]ue to the fluidity and nature of liquid money, it is hard to tell when the loan ends and Debtor's law firm business income begins." Reply to Trustee Facts ¶ 48. This type of commingling and lack of transparency reflects the kind of egregious conduct that courts

routinely find to justify a bar to discharge. *See In re Cefalu*, 2020 WL 1930136, at *7 (Bankr. N.D.N.Y. Apr. 13, 2020) (finding egregious conduct where the debtor "routinely plucked funds from the [business] account to pay personal expenses such as tuition payments to his daughter's college and his gym membership fees."). There are similar concerns when it comes to whether the New Rochelle Property is the Debtor's professional office or his personal home. *See, e.g.,* Jan. 2024 Dep. Tr. 7:11-18 ("the entire area [of the New Rochelle Property] is designated as a law office, we meet clients, client files, servers, 90-95% of my legal work consultations are done there . . . "); Reply to Motion ¶ 34 ("Maintenance of home law office property is also deductible or tax exempt as per our bookkeeper/CPAs/Accountants."); Answer ¶ 22 ("I work on nearly every floor of the home law office"); *but see* Am. Schedules at 7 [ECF No. 13] (claiming the entire amount of the New York State homestead exemption); *see also In re Guiliani*, 661 B.R. at 503 ("The lack of financial transparency is particularly troubling given concerns that [the debtor] has engaged in self-dealing and that he has potential conflicts of interest that would hamper the administration of his bankruptcy case.").[10]

Finally, the last factor as to the Debtor's courtroom demeanor can be assessed here through his filings and actions in the case. His pleadings are riddled with abusive language towards the counsel to the United States Trustee and others, which have resulted in this Court issuing numerous orders admonishing the Debtor. *See generally* Sept. 12, 2024 Hr'g Tr. [Case No 23-22095, ECF No. 168] (bench ruling detailing the Debtor's history of vexatious litigation, including the Debtor filing a Motion for Sanctions against the judge who issued a filing injunction against the Debtor, then denying Debtor's various filings that are irrelevant, inappropriate, and lacking a factual and legal basis); Order on Pending Matters [Case No. 23-

---

[10] The Debtor's approach to the New Rochelle Property goes beyond a lack of transparency, as will be clear in the discussion of the Section 727(2)(4) claim discussed *infra*.

22095, ECF No. 158] (summarizing the September 12, 2024 hearing and directing Debtor to refrain from filing further improper pleadings containing scandalous or offensive material); Answer ¶ 27 (Debtor accusing United States Attorney Zipes of being "simply too lazy to make an appointment to come and inspect" the books and records). The Debtor also has failed to appear at various court hearings or examinations, including the November 6, 2023, examination and the November 7, 2023 Zoom conference on discovery issues. *See* Nov. 7, 2023 Hr'g Tr. at 3–4:8 [Case No. 23-22095, ECF No. 84]. At a court-ordered examination, the Debtor refused to answer even foundational questions, such as whether he signed his own Petition. *See* Sept. Dep. Tr. 31:9–32:24. This Court and others have found his repeated delays and refusals to be unmeritorious or frivolous. *See*, *e.g.*, Zipes Decl. Ex. L (Second Circuit affirming the filing injunction against the Debtor and denying the appeal for "lack[ing] an arguable basis either in law or in fact."). In sum, Debtor's conduct does not reflect the actions of a "honest but unfortunate debtor." *In re Blankfort*, 217 B.R. 138, 143-44 (Bankr. S.D.N.Y. 1998) (collecting cases).

Assessing these eight factors in the context of the entire record in this case, the Court concludes that discharge should be denied to the Debtor under Section 727(a)(3). *See Pereira v. Gardner (In re Gardner)*, 384 B.R. 654, 666 (Bankr. S.D.N.Y. 2008) (denying discharge where the Trustee credibly testified that the "Debtor was uncooperative, that the Debtor failed to disclose the existence of the timeshares, and that the records the Debtor did produce were inadequate to understand or explain the Debtor's business and financial condition."); *Doubet v. Palermo (In re Palermo)*, 370 B.R. 599, 618 (Bankr. S.D.N.Y. 2007) (denying discharge where debtor "did not maintain records of his financial transactions, and his accountings [were] fraught with inaccuracies and inconsistencies"); *In re Frommann*, 153 B.R. at 115, 119 (denying

discharge where debtor provided the Trustee "with a morass of records consisting of bills, checks, bank statements and closing statements," but "no books of account were furnished to the Trustee").

II. <u>Section 727(a)(4)(A) for a False Oath</u>

Turning to the next substantive request for relief, Section 727(a)(4)(A) provides an exception to discharge where "the debtor knowingly and fraudulently, in or in connection with the case made a false oath or account." 11 U.S.C. § 727(a)(4)(A). In seeking a denial of discharge under Section 727(a)(4)(A), the movant must prove "by a preponderance of the evidence: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Forest v. Bressler (In re Bressler)*, 387 B.R. 446, 460 (Bankr. S.D.N.Y. 2008) (quoting *Baron v. Klutchko (In re Klutchko)*, 338 B.R. 554, 567 (Bankr. S.D.N.Y. 2005)). "Once the plaintiff makes a *prima facie* showing that [the] debtor knowingly made a false oath, [the] debtor must come forward with a credible explanation for his actions." *Nof v. Gannon (In re Gannon)*, 173 B.R. 313, 320 (Bankr. S.D.N.Y. 1994) (citing *First Texas Savings Assoc. v. Reed (In re Reed)*, 700 F.2d 986, 992–93 (5th Cir. 1983)). If a debtor is unable to provide this justification, a denial of discharge is appropriate. *See Gannon*, 173 F.2d at 320 (citing *Bank of India v. Sapru (In re Sapru)*, 127 B.R. 306, 316 (Bankr. E.D.N.Y. 1991)).

For purposes of Section 727(a)(4), "[a] debtor's petition and annexed schedules constitute a statement under oath[.]" *Gannon*, 173 B.R. at 320 (citations omitted). Additionally, a "statement" may be either an omission or an affirmative statement. *See Republic Credit Corp. v. Boyer (In re Boyer)*, 367 B.R. 34, 45 (Bankr. D. Conn. 2007). "Because a debtor is unlikely to

admit to having made a deliberate misstatement, an objector may prove knowledge of falsity . . . by proving that the debtor acted with at least a reckless disregard for the truth." *Bressler*, 387 B.R. at 461 (quoting *Town of Skaneateles v. Scott (In re Scott)*, 233 B.R. 32, 44 (Bankr. N.D.N.Y. 1998)); *see also Carlucci & Legum v. Murray (In re Murray)*, 249 B.R. 223, 228 (E.D.N.Y. 2000); *Scheidelman v. Henderson (In re Henderson)*, 423 B.R. 598, 618 (Bankr. N.D.N.Y. 2010).

To prove the fraudulent intent element, a plaintiff must establish "actual, not constructive fraud." *In re Bressler*, 387 B.R. at 460 (quoting *In re Klutchko*, 338 B.R. at 567). "[R]eckless indifference to the truth," however, also suffices to establish fraudulent intent for the purposes of Section 727(a)(4). *Bressler*, 387 B.R. at 460 (quoting *Klutchko*, 338 B.R. at 567). "The required intent may be found by inference from all of the facts . . . [and] depends largely upon an assessment of the credibility and demeanor of the debtor. . . ." *Id*. at 460–61 (internal citations and quotations omitted). Additionally, "the Second Circuit has recognized [that] fraudulent intent may be inferred from a series of incorrect statements contained in the schedules . . . ." *Castillo v. Casado (In re Casado)*, 187 B.R. 446, 450 (Bankr. E.D.N.Y. 1995). To satisfy Section 727(a)(4), "[a] plaintiff must show that the omitted information in the debtor's schedules occurred because the debtor exhibited a reckless indifference for the truth or intended to mislead his creditors, not because of mere carelessness or misunderstanding." *Harris v. D'Amico (In re D'Amico)*, 2008 WL 4552806, at *6, (Bankr. N.D.N.Y. Oct. 9, 2008).

Finally, "[a]ny matter bearing on the discovery of estate property or debtor's business dealings is material" for purposes of the Section 727(a)(4). *Gannon*, 173 B.R. at 319–20; *see also Bressler*, 387 B.R. at 461 ("A statement or omission is material if it is related to the debtor's business transactions, concerns the discovery of assets, business dealings, or the existence or disposition of the debtor's property.") (internal citations omitted). "[M]ateriality does not require

a showing that the creditors were prejudiced by the false statement." *In re Murray*, 249 B.R. at 229 (internal citations omitted). "Omissions that do not affect the value of the estate may nevertheless be material if they hinder the trustee's or creditor's ability to investigate the debtor's pre-bankruptcy dealings and financial condition, even if such an investigation would not have benefitted creditors." *Gordon*, 535 B.R. at 538.

Applying these standards here, the Court finds that the Debtor made a false statement under oath under Section 727(a)(4) in two ways: (1) in his bankruptcy schedules as to the value of his law firm at $100; and (2) in his statements about the New Rochelle Property.

1. Statements about the Value of the Debtor's Law Practice

Debtor's statements about the value of his law firm satisfy each of the requirements of Section 727(a)(4) for a false statement under oath.

First, the Debtor valued Manchanda Law Firm at $100 in his Petition, Schedules, and SOFA. The Debtor signed these documents under penalty of perjury, certifying that he examined them and that the information contained therein was true and correct. *See* Petition; Schedules; SOFA. Further, Debtor testified under oath at the March 9, 2023, Creditors' Meeting that he had reviewed the Petition, Schedules, and SOFA. *See* Compl. Ex. C at 5:15-6:7.

Second, the $100 valuation of the Manchanda Law Firm was false. At the time the statement was made, Debtor and his non-filing wife were both employed by the Manchanda Law Firm and reportedly receiving a combined monthly salary of at least $7,527.53, for a combined annual total of over $90,000. *See* Schedules pp.1-2 [ECF No. 5]. Despite these numbers, the Debtor has offered no explanation for his $100 valuation, instead merely steadfastly stating that he does not know why the Manchanda Law Firm was valued at $100 in his Schedules and SOFA. *See* Answer ¶ 42; Reply to Motion ¶ 133. The Debtor's continued refusal to provide an

informative and transparent basis for this valuation, coupled with his failure to investigate the question, constitutes a reckless indifference to the truth. *In re Charles*, 474 B.R. 680, 684 (B.A.P. 8th Cir. 2012) (finding a debtor's repeated undervaluation of assets and failure to disclose income constituted false oaths with requisite knowledge).[11]

Third, Debtor knew the statements were false. Debtor states that he doubted the valuation's accuracy, attributing the valuation to his former attorney. Answer ¶¶ 42, 45 ("To be honest, I still really don't know how he arrived at that number . . . These were all Bruce Bronson's calculations, valuations, numbers and work product."); Reply to Motion ¶ 130 ("Debtor had no reason (and still has no reason) to believe that bankruptcy lawyers Bruce Bronson's legal work and expert valuations were flawed or erroneous . . . ."); May 16, 2023 Hr'g Tr. 27:6-20 [Case No. 23-22095, ECF No. 43] ("[Regarding the] law firm valued at $100 . . . we are owed $600,000 in unpaid legal fees . . . we have a bunch of beat-up laptops, and we rent a virtual office. . . . You tell me if it's worth more than 100 bucks."). But reliance on counsel is not a defense when material misrepresentations are "transparently plain." *Zizza v. Harrington (In re Zizza)*, 875 F.3d 728, 732 (1st Cir. 2017); *see also In re Botticelli*, 2022 WL 17683407, at *10 (Bankr. E.D.N.Y. Dec. 14, 2022) ("Where a misstatement or omission in the petition should have been plainly obvious to the debtor, '[c]ourts do not permit [the] debtor to play ostrich . . . and then disclaim[ing] all responsibility for statements which he made under oath.'") (quoting *In re Carl*, 517 B.R. at 70). In any event, the Debtor was specifically advised by the Court to change the valuation if it was incorrect. At the May 16, 2023 hearing, for example, the Court advised the Debtor that "[if] the number you think Mr. Bronson chose is incorrect, you should change

[11] The value of the Manchanda Law Firm certainly has changed after he submitted his Petition as a result of the Debtor's disbarment, an event that occurred well after the Petition, Schedules, and SOFA were filed. But that does not change the fact that the Debtor's filings, at the time they were made, were clearly incorrect. In any event, the Debtor has never filed an updated or amended valuation for the law firm.

that number and amend the schedules and information." May 16, 2023 Hr'g Tr. 44:6-15 [Case No. 23-22095, ECF No. 43]. As the docket reflects, despite such reminders from the Court and the United States Trustee, Debtor took no steps to amend the valuation in his Schedules or SOFA. Debtor instead stated that he "does not have the training nor the bankruptcy lawyer needed to 'amend' or 'change' his Schedules, nor does he see a need to do so." Reply to Motion ¶ 80. This excuse is unpersuasive. Debtors are required to provide such information and do so routinely, regardless of whether they have counsel or are proceeding *pro se*. 11 U.S.C. § 521; *In re Brody*, 671 B.R. 34, 41 (Bankr. S.D.N.Y. 2025) ("The debtor has a continuing obligation to update financial disclosures post-petition.") (citation omitted). Moreover, this Debtor has experience filing schedules *pro se* as evidenced by his filing of numerous prior bankruptcy cases. Further, he is well aware of his obligations of candor in court filings given his training as an attorney. At the end of the day, the statement of valuation was made under oath by the Debtor, the significance of which would have been understood by a then-practicing and licensed attorney.

Fourth, Debtor acted with fraudulent intent. "Fraudulent intent may be shown through circumstantial evidence or inferences from a course of conduct, all surrounding circumstances, and any evidence of a course of conduct." *Darwin (Huck) Spaulding Living Trust*, 517 B.R. at 69 (citing *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582–83 (2d Cir. 1983)). "The reckless indifference standard applies when a pattern of conduct evinces an obvious pattern of deceit that flies in the face of the purpose of the Bankruptcy Code." *Dranichak v. Rosetti*, 493 B.R. 370, 379 (N.D.N.Y. 2013) (internal citations omitted). "Numerous omission[s] may demonstrate such a pattern." *Id*. Here, Debtor has filed multiple bankruptcy petitions, both in his individual capacity and on behalf of Manchanda Law Firm. These prior bankruptcy filings confirm the Debtor's fraudulent intent here. In both the Second Manchanda Law and Third

Manchanda Law Bankruptcy filings, Debtor reported accounts receivables of over $100,000. Petition at 9 [Case No. 23-11805, ECF No. 1] ($253,217.00 in accounts receivable); Petition at 7 [Case No. 25-22828, ECF No. 1] ($106,275 in accounts receivable). In the Second Manchanda Law Firm Bankruptcy alone, the Debtor listed the firm as having separate assets worth an estimated $500, putting aside the value of the firm's accounts receivable. Petition at 12, 14 [Case No. 23-11805, ECF No. 1] (listing chairs, laptops, desks and office supplies as being worth $400 and the Manchanda Law Firm web domain as worth $100). This gross disparity in assets previously identified and Debtor's steadfast refusal to update—or explain—the $100 valuation in this case reveals a pattern of reckless indifference to the truth sufficient to find fraudulent intent.

Fifth, Debtor's omissions and statements were materially related to the bankruptcy case. The valuation of the Manchanda Law Firm is clearly material as to the administration of the Debtor's bankruptcy case.

2. <u>Statements about the New Rochelle Property</u>

The Debtor's statements about the New Rochelle Property also satisfy the requirements for a denial of discharge under Section 727(a)(4)(A).

The Debtor's statements about the New Rochelle Property must be understood in the context of his lack of disclosure about his assets generally. As previously discussed, the Debtor failed to provide information that is essential to understanding his assets and liabilities. *See supra* Discussion Section I. This lack of information impacts the ability of creditors—and the Court—to understand the status of potentially the largest asset of the estate: the New Rochelle Property.

Given this information deficit, we look to the information that we do have as to the New Rochelle Property. As it turns out, the representations of the Debtor are inconsistent as to the

New Rochelle property. On the one hand, the Debtor declared, under penalty of perjury, that his debts were primarily consumer debts, as defined under 11 U.S.C. § 101(8). Petition at 12. The most significant debt listed in his Schedules is the Internal Revenue Service's lien on the New Rochelle Property. Petition at 20, 23. Consumer debt is defined under the Bankruptcy Code as "debt incurred by an individual primarily for personal, family, or household purpose." 11 U.S.C. § 101(8). Moreover, the Debtor claimed the full homestead exemption on the New Rochelle Property in Schedule C, *see* Am. Schedules at 7 [ECF No. 13], with such homestead exemption only being available for a debtor's principal residence. *See* N.Y. C.P.L.R. § 5206(a) ("Property . . . owned and occupied as a principal residence, is exempt from application to the satisfaction of a money judgment . . . ").

But while representing the New Rochelle Property as his personal homestead and his debts as largely consumer, the Debtor has been simultaneously suggesting that the New Rochelle Property is a business asset. The Third Manchanda Law Filing Schedules list the mortgage on the New Rochelle Property as an asset of the Manchanda Law Firm. Petition at 11 [Case No. 25-22828, ECF No. 1]. Thus, the Debtor's Schedules in his personal bankruptcy case note that he "pays his mortgage from his business since he uses it for business purposes." Schedule J at 2 [ECF No. 5]; Jan. 2024 Dep. Tr. 119:22-24 (Debtor testifying that he uses the New Rochelle Property for "99 percent of [Debtor's] legal work"). Indeed, Debtor deducts landscaping charges as a business expense because "[m]aintenance of home law office property is also deductible or tax exempt as per our bookkeepers/CPAs/Accountants." Reply to Motion ¶ 34. Further muddying the waters, however, the Debtor purchased the New Rochelle Property in his individual name, not under the name of his law firm and the Debtor has no lease with his

business for the alleged use of the property as a commercial office. *See* Petition at 28; Zipes Decl. Ex. K.

As to the first element of false statement, therefore, the Debtor's characterizations about the nature and use of the New Rochelle Property are inconsistent: he claims it is solely a personal asset by seeking the full homestead exemption, on the one hand, and contends that it is used as his business office, on the other. Debtor made all relevant statements in his Petition and Schedules under penalty of perjury about the New Rochelle Property. Petition at 8, 12, 20.[12]

As to falsity and intent, Debtor knew his various statements regarding the New Rochelle Property could not all be true. But there were advantages to each. By listing the New Rochelle Property as his personal residence, the Debtor has claimed the full value of the homestead exemption to protect a significant portion of the value of the house as exempt from distribution to creditors. 11 U.S.C. §§ 522(b) (authorizing Debtors to exempt property from property of the estate); N.Y. C.P.L.R. § 5206(a) (exemptions for real property owned and occupied as a principal residence).[13] However, by characterizing the New Rochelle Property as his place of business, the Debtor can reap other benefits. He can deduct various property expenditures as business expenses; such a characterization also appears intended to avoid running afoul of the terms of the

---

[12] In perhaps his best attempt at an explanation, the Debtor represented in his deposition that the New Rochelle Property is a "home law office" that was "separate from [his] primary residence" as "the entire bottom is the law office, but [Debtor and his family] happen to live upstairs." Jan. 2024 Dep. Tr. 118:13-119:3. But it is unclear how such a hybrid use of the New Rochelle property would be consistent with the representations above about the property.

[13] Courts within this jurisdiction recognize the existence of a "home office" but vary on whether a Debtor may claim a homestead exemption depending on the facts and circumstances. *See e.g. In re Hager*, 74 B.R. 198, 201 (Bankr. N.D.N.Y. 1987), *aff'd.* 90 B.R. 584, 588 (N.D.N.Y. 1988) (calculating the percentage of square footage of the building used for the Debtor's chiropractic practice and holding the Debtor's homestead exemption did not apply to this section); *but see In re Vizentinis*, 175 B.R. 824, 826 (Bankr. E.D.N.Y. 1994) (applying the full homestead exemption and rejecting *Hager* where the property held four residential units with the Debtor residing in one, because the *Hager* approach would create "a *de facto* condominium"). The Court need not decide such an issue today. The issue for today is whether the Debtor has provided the documents necessary for creditors to understand the situation, such as the source of the funds used to purchase the New Rochelle Property, including the amount of funds from the SBA Loan used for the purchase.

SBA Loan, which explicitly requires that the loan proceeds be used for a small business "solely as working capital to alleviate economic injury." SBA Loan Documents at UST-000049.

The Court is mindful that debtors in bankruptcy will occasionally make mistakes in their schedule or in claiming exemptions. But when confronted with such errors, a debtor has an obligation to correct such errors or clarify the situation. When such corrections are timely made, they provide a defense against claims for non-dischargeability for false oath. *See In re Tabibian*, 289 F.2d 793, 797 (2d Cir. 1961) (later disclosure may be considered as evidence of innocent intent); *see e.g. In re Kelly*, 135 B.R. 459, 462-63 (Bankr. S.D.N.Y. 1992) (granting a discharge where a debtor's conduct to correct a false record "went a long way toward vitiating his impropriety."); *In re McGowan*, 18 B.R. 981, 983-84 (Bankr. E.D.N.Y. 1982) (finding no intent to mislead where a debtor quickly corrected an error in his schedules). But that is not what happened here. When confronted with these inconsistencies, this Debtor refused to clarify the record. Instead, he obfuscated. He attempted to disclaim knowledge, stating in his Reply that the "Debtor, to this day does not know what a 'homestead exemption' is." Reply to Motion ¶ 71. This claim is contradicted by his own prior bankruptcy petition in which Debtor, filing *pro se*, where he both claimed and properly cited the New York State exemptions for personal property. Petition at 11 (Schedule C) [Case No. 13-12880-mg, ECF No. 1]. Debtor also claimed ignorance about the SBA Loan Application, stating that he "does not recall signing anything on the SBA Loan." Debtor's Reply to Facts ¶ 44. Yet, the modest documents provided by the Debtor include the SBA Loan Documents showing that "Rahul Manchanda" electronically signed the Loan Agreement. *See* SBA Loan Documents at UST-000053-UST-000065, (Original Loan Agreement), UST-000079-UST-000086 (First Loan Modification Agreement). In short, the Debtor's evasive and inconsistent representations about the New Rochelle Property were made

with "reckless indifference to the truth." *In re Charles*, 474 B.R. at 684 (finding the debtors repeated undervaluation of assets and failure to disclose income constituted false oaths with requisite knowledge); *In re Diorio*, 407 F.2d 1330, 1330-31 (2d Cir. 1969) (upholding a denial of discharge for false oaths where a debtor's actions and testimony constituted reckless indifference to the truth); *In re Grover*, 675 B.R. 270, 288-289 (Bankr. S.D.N.Y. 2025) (inferring fraudulent intent where a debtor provided unconvincing explanations to numerous omissions and incorrect disclosures of assets). The Debtors representations were all made under oath, penalty of perjury, or in signed filings, making statements about the nature and use of the New Rochelle Property false within the meaning of § 727(a)(4)(A).

Fifth, Debtor's statements regarding the New Rochelle Property are material. The use and nature of the New Rochelle Property concerns one of the Debtor's purported main assets and the validity of the Debtor's claimed homestead exemption. As such, the subject matter bears directly on the administration of the estate including the propriety of the homestead exemption claimed by the Debtor, which materially impacts the distribution to creditors.[14]

[14] Given the Court's ruling today on the UST's counts under Sections 727(a)(3) and 727(a)(4)(A), the Court need not address the UST's third request for relief under Section 727(a)(5). *In re Handel*, 266 B.R. 585, 588. Such relief is denied without prejudice.

## CONCLUSION

For the reasons set forth above, the Court grants the UST's Motion on its claims under 11 U.S.C. Sections 727(a)(3) and 727(a)(4)(A). The UST should settle an order on five days' notice. The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice. A copy of the notice and proposed order shall also be served upon the Debtor.

Dated: White Plains, New York
September 30, 2026

***/s/ Sean H. Lane***
Hon. Sean H. Lane, Chief Judge
United States Bankruptcy Court